1
2
3
4
5
6
7
8

**VENABLE LLP**
Ryan M. Lapine (CA SBN 239316)
RMLapine@Venable.com
Rodney S. Lasher (CA SBN 307462)
RSLasher@Venable.com
Rachel E. Conover (CA SBN 344495)
REConover@Venable.com
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone:   310.229.9900
Facsimile:    310.229.9901

*Attorneys for Plaintiff*
*Sean P. McGrath*

9
10

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

11
12
13
14
15
16
17

SEAN P. MCGRATH, a Massachusetts citizen,

          Plaintiff,

   v.

PALOWET INVESTMENTS, LLC, a California limited liability company, and DOES 1 through 10, inclusive,

        Defendants.

Case No.

**COMPLAINT FOR:**

  **1. VOIDABLE TRANSFER; and**

  **2. CIVIL CONSPIRACY**

**<u>JURY TRIAL DEMANDED</u>**

18
19
20
21

**V E N A B L E   L L P**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

-1-
COMPLAINT

Plaintiff Sean P. McGrath ("Plaintiff" or "McGrath"), alleges the following against Defendant Palowet Investments, LLC ("Palowet") and DOES 1 through 10, inclusive (collectively, "Defendants") as follows:

## **INTRODUCTION**

1.      McGrath fell victim to a Ponzi scheme perpetrated by the late Johnny D. Cope ("Cope") and his co-conspirators, including career felon Michael Booth ("Booth").  Cope and Booth induced McGrath and multiple other investors to "loan" millions of dollars, promising to use the money to finance a golf cart operation and to repay the loans with a premium and interest.  In reality, the conspirators deigned to defraud their targets, pocketed a significant portion of the proceeds, and used the incoming money from newer loans to pay off older loans.  In the end, multiple victims, including McGrath, were left with large losses.

2.      Although McGrath was not aware until early 2022 that Cope was an active participant in the Ponzi scheme as opposed to a gullible friend of Booth, Cope was a key participant from the outset.  Cope provided Booth access to an exclusive private club populated by the extremely wealthy.  There, Cope delivered potential investors to Booth and vouched for the legitimacy and safety of the business operation to those potential investors.  Cope collaborated closely with Booth on the scheme and took affirmative acts to advance it, including: (a) opening the primary bank account in his own name and that of a co-conspirator used to facilitate and perpetuate the fraudulent financial transactions at the heart of the scheme after the

COMPLAINT

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

previous primary account became susceptible to an injunction and judgment collection; and (b) paying settlements to eliminate litigation that could have exposed and halted the Ponzi scheme.

3.     On September 4, 2020, McGrath filed a lawsuit in the U.S. District Court for the District of Massachusetts, Case No. 20-cv-11651-FDS, against Booth for losses due to the Ponzi scheme run by Booth and, unbeknownst to McGrath at the time, Cope ("Booth Litigation").  On January 20, 2023, judgment was entered in McGrath's favor against Booth in the amount of $3,107,195.43 plus attorney's fees of $182,862.48, though it appears unlikely he will be able to collect on that judgment.

4.     Cope died in December 2020.  Initially, Jonathan Patrick Cope ("J.P. Cope") was appointed as the executor of Cope's Estate.  McGrath is concurrently filing litigation against, *inter alia*, the Estate of Johnny D. Cope (the "Estate"), J.P. Cope, and its current executor, Kyleigh Brewer ("Brewer"), in the United States District Court for the Western District of Texas.

5.     Other victims of the Ponzi scheme brought suit against Cope and his Estate, including an action brought by an LLC victim and later dismissed without prejudice prior to Cope's passing.  To avoid having to pay those victims and potentially other creditors, the Estate liquidated certain of its assets for less than market value.  In turn, J.P. Cope and potentially others entered valuable side deals

COMPLAINT

with those purchasers to wrongfully maximize their own recovery at the expense of creditors.

6.     At issue in this action, the Estate sold a residential property owned by the Estate, 149 Netas Drive, Palm Desert, California 92260 ("Bighorn Property") to Palowet for $2.8 million.  The Bighorn Property was not marketed for sale to the public.  Its sale price was a fraction of its fair market value.

7.     Through this action, McGrath seeks to void the fraudulent transfer of the Bighorn Property to Palowet and return it to the Estate, preserving the Estate's assets for the benefit of its creditors, including victims of Cope's Ponzi scheme.

## **PARTIES**

8.     Plaintiff Sean P. McGrath is an individual who at all relevant times hereto has resided in Weston, Massachusetts.   McGrath is a citizen of the Commonwealth of Massachusetts.

9.     Defendant Palowet Investments, LLC is a California limited liability company with its principal place of business at 149 Netas Drive, Palm Desert, California 92260.  It may be served by service on its agent, Mark McGowan, at 72-630 Fred Waring Drive, Suite 201, Palm Desert, California 92260.

10.    Plaintiff is unaware of the true names and capacities of the defendants sued as DOES 1 through 10, inclusive, and it, therefore, sues these defendants by fictitious names.  Plaintiff alleges on information and belief, that each of the Doe Defendants is in some manner liable to Plaintiff.  Plaintiff will amend this Complaint

COMPLAINT

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

1    to state the true names and capacities of DOES 1 through 10 when their names and

2    capacities, along with their responsibility for the actionable conduct alleged herein,

3    have been ascertained.

4    **VENUE AND JURISDICTION**

5    11.    This Court has diversity subject matter jurisdiction over this action

6    pursuant to 28 U.S.C. § 1332(a)(1) because it is between citizens of different states

7    and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8    12.    This Court has personal jurisdiction over Palowet because it is a

9    corporate entity with its principal place of business located within this District.

10   13.    Venue is proper in this District and this Division pursuant to 28 U.S.C.

11   § 1391(b) as it seeks to void the sale of real property located in Riverside County.

12   **FACTUAL ALLEGATIONS**

13   **Michael Booth is a Prolific Career Felon**

14   14.    Michael Booth is a career felon with a well-documented history

15   organizing and running Ponzi schemes.  In 1995, Booth pleaded guilty to "engaging

16   in an advance-fee scheme whereby he would receive advance fees for financing

17   leases with no intention, or capacity, to finance such," *U.S. v. Booth*, No. 99 CR 18,

18   2010 WL 5394879 (E.D. Wash. Dec. 23, 2010), for which he was sentenced to 18

19   months in prison.

20   15.    After his release, Booth orchestrated a new scheme, again using an

21   equipment leasing business as a front.  As detailed in *U.S. v. Booth*, 309 F.3d 566

**VENABLE LLP**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

(9th Cir. 2002), Booth and his co-conspirator promised to find nearly $400 million in financing for distressed companies, which paid Booth nearly $2 million in advanced fees.  Booth and his co-conspirator were later found to have "spent the fees as they came in, on salaries for employees and for their own personal expenses, including, among other things, the rental of a jet airplane, automobile leases, jewelry, trips to Las Vegas, and golf lessons." *Id.* at 570.

16.    The Appeals Court noted that this was not Booth's first foray into financial fraud, finding that "civil judgments for fraud [] had been entered against Booth in the past," and that he "had knowledge of the harm he would cause in taking advantage of desperate individuals because of harm he had caused to other individuals in the past." *Id.* at 577.

17.    A later appellate court noted that the District Court had been justified in elevating Booth's sentence given "the sheer number of Booth's crimes and [] the fact that Booth had preyed on gullible victims and caused serious financial and emotional harm." *U.S. v. Booth*, 200 F. App'x 678, 679 (9th Cir. 2006).  It confirmed "Booth had engaged in similar fraudulent activities in the past." *Id.*

18.    Booth was convicted for multiple felony counts of wire fraud and money laundering.  Booth served over twelve years in a federal penitentiary.

COMPLAINT

**The Golf Cart Scheme**

19.     After his release from federal prison in or about 2013, Booth moved to Coachella Valley in California and returned to his old ways.  This time, a luxury golf cart business served as the front for a Ponzi scheme (the "Golf Cart Business").

20.     The scheme worked as follows.   Booth and his co-conspirators established what appeared to be legitimate businesses that purchased golf cart chassis and parts, refurbished and assembled them into high-end golf carts, and sold them at a profit.  Booth and his co-conspirators targeted wealthy individuals not only to buy golf carts, but to invest in the Golf Cart Business.  The investors were told that the Golf Cart Business was highly profitable, but that it required short-term loans to finance the operation.  They were assured that the loans would be fully repaid along with a premium and high rate of interest.

21.     In fact, Booth and his accomplices never intended to use the funds to finance the Golf Cart Business, nor did they do so.  Instead, they used most of the money to fund their extravagant lifestyles and to pay back previous investors—*i.e.*, a classic Ponzi scheme.

**Cope's Role in the Golf Cart Scheme**

22.     The Golf Cart Business was not solely Booth's enterprise.  He needed high-net worth targets to invest in his scheme.  He lacked connections to such a network having spent the better part of his adult life in prison.  Booth needed co-conspirators to introduce him to potential victims, to persuade investors it was safe

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

1  and sound to invest their money in the Golf Cart Business even though it was being

2  run by an ex-felon who had swindled investors in numerous businesses, and to

3  facilitate financial transactions when Booth's operation was under scrutiny.

4      23.    Enter the late Johnny D. Cope.

5      24.    Johnny D. Cope held himself out as extremely wealthy and socialized

6  with those who actually were.  Cope was a well-connected businessman with deep

7  ties to Texas, New Mexico, and California.  The Albuquerque Journal described

8  Cope as "a deal-maker, mover-and-shaker and kingmaker in state government and

9  politics."  Thomas Cole, *Tycoon Backs Gov. All the Way; Hobbs Businessman Has*

10  *Helped Raise Millions, But He's Had His Share of Controversy*, ALBUQUERQUE J.,

11  July 8, 2007, at A1.  However, Cope's "rise to the top" was not "without troubles:

12  business setbacks, a drug problem that led to jail time and a couple of stormy

13  marriages that involved allegations of abuse." *Id.*

14      25.    Among other enterprises, Cope owned several racehorses and had deep

15  ties to racetracks, casinos and gambling operations, including the Ruidoso Downs

16  Race Track & Casino in Ruidoso, New Mexico, where Cope owned a multimillion-

17  dollar home.

18      26.    One may recall that in the Oscar-nominated west Texas epic movie,

19  *Hell or High Water*, the protagonists relied on a casino to launder their stolen money.

20      27.    Cope was an avid golfer and a longtime member and part-time resident

21  of the exclusive Bighorn Golf Club in Palm Desert, California.   Bighorn is

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

recognized as "one of the top private residential golf club communities in the country." It contained just the type of membership that Booth required to run his scheme. But, it has notoriously closed doors to outsiders and non-members.

28.     Cope and Booth became inseparable in the Coachella Valley, a relationship that seems an odd coupling if and only if Cope's own previous brushes with the law and strained personal finances are overlooked. Upon information and belief, Booth and Cope's relationship extended back to before Booth served over a decade in Federal prison

29.     Cope was aware that Booth's Golf Cart Business was a fraudulent enterprise and that Booth was a repeat felon. Booth did not hide his criminal past from Cope. In fact, one of Booth's schemes tanked an established business in the Coachella Valley that left elderly investors penniless. Cope knew of this scheme because Booth and one of Cope's confidants, R.D. Hubbard, profited from it.

30.     While many of Booth's victims were not aware of the multiple high-interest loan transactions Booth entered into, Cope, a sophisticated businessperson, was a party to discussions with Booth regarding these loans and knew or should have known that Booth was taking out new loans to pay back old loans. Indeed, Cope openly joked that Booth was a "money launderer."

31.     Nonetheless, Cope gave Booth entry into Bighorn where he vouched for his golf cart products, introduced him to other members, and gave him unfettered access to the Bighorn clubhouse, a real-life billionaire boys club. Cope encouraged

Bighorn members to invest in the Golf Cart Business, vouching for it and representing that he was a participant in it to give it the appearance of legitimacy.

32.     At the same time, Booth and Cope shared exotic cars, private airplanes, and a conspicuous designer bag filled with large amounts of cash, which Cope and Booth used for, among other matters, high-stakes card games in the Bighorn clubhouse.

33.     To potential investors, Booth was direct about his history but represented that he had changed and now was running a legitimate business operation.  Cope's vouching for Booth was necessary for Booth and him to attract victims to the Ponzi Scheme.

34.     In 2018, M. Earl Morley, Jr., one of the first of the Bighorn investors Cope delivered to Booth, alerted Cope that Booth had defaulted on loans Morley and an LLC had provided.  Morley also told Cope that Booth had personally told a fantastic series of lies involving an apocryphal cancer-addled daughter to explain the default, had begun to liquidate his storefront to avoid an imminent court issued injunction, and was rapidly closing the bank account used to run his business to avoid collection activities.

35.     *After* being informed of these facts, Cope opened a bank account in New Mexico in his own name and in the name of Camilla Hoffman (the "Ruidoso Account").  The Ruidoso Account replaced the account Booth had been using to run the Golf Cart Business, and Cope and Booth began running the financial transactions

COMPLAINT

1   at the heart of their Ponzi scheme out of and through the Ruidoso Account.  Cope

2   explicitly took over the Ponzi scheme's financing, putting it in his own name.

3       36.    The Ruidoso Account allowed Cope and Booth to continue running the

4   fraudulent investment operation after it should have collapsed given legal efforts

5   undertaken by Morley and an LLC Morley managed to recover on their debts,

6   including a preliminary injunction that would have otherwise shut down the

7   financing of the scheme and ground it to a halt.

8                    **Cope and Booth Target McGrath**

9       37.    Cope and Booth targeted McGrath, a wealthy member of the Bighorn

10  Golf Club.

11      38.    Cope, who McGrath mistook for a friend, and Booth represented to

12  McGrath that Booth required short-term loans to purchase a fleet of golf carts to

13  improve and sell for a profit.  Cope represented that Booth was a legitimate

14  businessman and was seeking investments for legitimate business purposes.

15      39.    These representations were false.  Booth never intended to use these

16  monies to purchase a fleet of golf carts for sale, nor did he use funds received from

17  McGrath (and others) for this purpose.

18      40.    McGrath reasonably relied on Cope's representations because Cope's

19  status as a prominent member of the Bighorn Golf Club lent legitimacy to the

20  representations he made regarding Booth's business of selling high end golf carts to

21  other members of the Bighorn Golf Club.  McGrath was not aware, and had no

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

reason to suspect, that Booth and Cope were operating a Ponzi Scheme together or that Cope would later open the bank account from which the Ponzi Scheme was run. McGrath was not aware of Cope's "troubles" - his "business setbacks," his "drug problem that led to jail time," and his tenuous finances.

41.   On January 17, 2018, relying in large part on Cope's representations and assurances as described above, McGrath entered into a written promissory note ("January Promissory Note"), pursuant to which McGrath loaned Booth $250,000 with interest to be paid at twenty-five percent (25%), with payment in full in the amount of $312,500 on the loan due February 14, 2018.

42.   Those funds were not used to purchase a fleet of golf carts for sale; instead, Booth used the money to fund his extravagant lifestyle, paying for his membership to an elite club, his rent for a luxury condo at that elite club, private jet rentals, and to pay back previous investors he had bilked who were then demanding the return of their investments.  For his part, Cope rented private jets and carried around a large designer bag filled with cash. Booth and Cope used that cash, including for high stakes card games in the Bighorn club house.

43.   Booth did not repay this loan when it became due.

44.   On February 21, 2018, Booth and McGrath entered into a letter agreement which called for the January Promissory Note loan to be repaid in full, with interest, on March 14, 2018.

V E N A B L E   L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

-12-

45.     On March 6, 2018, McGrath entered a second promissory note with Booth ("March Promissory Note"), pursuant to which McGrath loaned Booth $180,000, with a twenty percent (20%) interest rate, to be repaid in full by Booth by April 6, 2018, at $216,000.

46.     Booth represented to McGrath that he needed additional funds to clear title on certain of his luxury automobiles, which he could then sell and use the proceeds to make the payments to McGrath required under both the January and March Promissory Notes.

47.     But the funds received from McGrath were not used to clear title on certain of Booth's purported luxury automobiles; instead, these monies were used fund Booth's extravagant lifestyle, paying for private club memberships, to wine and dine his friends, and for private jet travel.  Indeed, Booth testified under oath at his deposition in another matter that he never owned any of the cars that he drove, he simply drove them with permission.

48.     Booth did not repay either loan when due or even after repeated demands.  Instead, as conveyed to McGrath in writing, Booth concocted a story involving an attorney named "John" who somehow controlled Booth's funds and prevented repayment.

49.     Booth's written explanations and excuses were false.  His account contained sufficient funds to repay McGrath.  But instead of being used to do so, the funds flowed into the Ruidoso Account.  In other words, funds from the account to

COMPLAINT

which McGrath had transferred the proceeds of the January Promissory Note and the March Promissory Note, which should have used to pay back McGrath, instead were transferred to the Ruidoso Account, which Cope owned and operated.

50.     At the time that Booth failed to make the agreed payments to McGrath, McGrath did not know of and had no reason to know of Cope's involvement with the Ponzi Scheme.  Indeed, McGrath and Cope remained friendly through 2018 and beyond.

**Cope Continues to Vouch for Booth to Prevent Discovery of the Ponzi Scheme and His Own Involvement**

51.     On or around November 4, 2018, the *Desert Sun* published an exposé on Booth, reporting that numerous individuals had filed lawsuits complaining that they had invested money in the Golf Cart Business but had been swindled by Booth and his co-conspirators.  *See* Amy DiPierro, *Salesman Accused of Golf Cart Hustle; Investors Say Smooth-Talking Former Convict Took Them for a Financial Ride*, DESERT SUN, Nov. 4, 2018, at A21.

52.     Upon information and belief, the publication of the *Desert Sun* exposé significantly hindered Cope, Booth, and their accomplices from soliciting new investments into the Golf Cart Business.  Without an actual, profitable business, the operation's remaining funds quickly dried up and/or were fraudulently transferred to Booth and/or his co-conspirators, including a series of seven-figure transfers to

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

1  various co-conspirators, leaving insufficient capital to repay the debts of the Golf

2  Cart Business.

3      53.    Despite the publication of the *Desert Sun* article, Cope continued to

4  make false assurances to McGrath that his loans would be repaid.

5      54.    Moreover, Cope continued to provide Booth with unfettered access to

6  Bighorn into 2019, repudiating the article and defending Booth.

7      55.    While McGrath knew that Booth and Cope were friends, he had no idea

8  that Cope had, among other acts, opened a bank account in New Mexico to operate

9  the Ponzi Scheme, had paid settlement monies to protect the Ponzi Scheme from

10  liability that would end it, had purchased luxury vehicles in his name with Ponzi

11  Scheme funds that he shared with Booth, and had taken cash from the Ponzi Scheme

12  for his own use and enjoyment.  McGrath therefore had no reason to disbelieve

13  Cope's continued reassurances regarding Booth.

14      56.    Indeed, into 2019, Cope continued to publicly socialize with Booth and

15  provide him with access to the Bighorn and its members, disavowing the article,

16  ensuring investors that Booth was engaged in legitimate business.  McGrath

17  reasonably believed, based on his relationship with Cope, Cope's standing in the

18  community, and based on Cope and Booth's express representations, that the only

19  thing standing in the way of repayment of his debt was an attorney named "John."

20

21

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

**The Ponzi Scheme Victims Sue Booth and Cope's Estate, Putting the Estate on Notice of Unfiled Claims Against It**

57.     Over time, the victims of Booth and Cope's Ponzi Scheme began fighting back, putting Cope's Estate on notice of its liability to victims of the Ponzi Scheme.

58.     On July 5, 2018, Bighorn Ventures, LLC ("Bighorn Ventures"), one of the victims of the Ponzi Scheme, commenced an action in Los Angeles Superior Court against several Defendants, including Booth, for damages resulting from Cope and Booth's Ponzi Scheme and to enforce a security interest in the inventory of the Golf Cart Business.  *Bighorn Ventures, LLC v. Lacern Performance Golf Cars, Inc. et al.*, Case No. BC712644 (Cal. Sup. Ct.).

59.     On July 24, 2020, Bighorn Ventures commenced an action in Los Angeles Superior Court against several Defendants, including Cope, for violations of the security interest that Bighorn Ventures had obtained in the inventory of the Golf Cart Business.  *Bighorn Ventures, LLC v. Balboa Bay Club Ventures, LLC*, Case No. 20STCV27985 (Cal. Sup. Ct.) (the "Cope Action").

60.     Though Bighorn Ventures dismissed that action, and dismissed it with prejudice as to certain defendants, it notably dismissed it without prejudice as to Cope and informed his counsel of its intent to revive the action against him.

61.     Separately, on January 26, 2020, Convoy Capital, LLC ("Convoy"), another victim of the Ponzi Scheme, commenced an action in Clark County, Nevada

COMPLAINT

1   against Booth and others for defaulting on loans Convoy extended to the Golf Cart

2   Business. *Convoy Capital, LLC v. DMB-B.T.,* et al., Case No. A-20-808688-B

3   (Nevada D. Ct.). On January 29, 2021, the Nevada court entered judgment against

4   Booth and the other Defendants in the amount of $2,451,250.00 plus interest, and

5   awarded attorneys' fees and costs in the amount of $138,460.77.

6      62.   On July 9, 2021, Convoy commenced an action in Midland County,

7   Texas, against Cope's Estate to recover their damages stemming from Cope's

8   involvement with the Ponzi Scheme. *Convoy Capital, LLC v. Jonathan Patrick*

9   *Cope, as Executor of the Estate of Johnny D. Cope, Deceased*, Case No. CV57762

10  (Tex. D. Ct.).

11     63.   As a result, the Estate was or should have been on notice that Cope and

12  Booth had defrauded many investors in the Golf Cart Business and that the Estate

13  faced potential liability to those victims.

14  ### McGrath Obtains a Judgment Against Booth

15     64.   On September 4, 2020, McGrath commenced an action in the U.S.

16  District Court for the District of Massachusetts against Booth and DMB-BT, an

17  entity that held the original bank account for the Ponzi scheme, for defaulting on the

18  January and March Promissory Notes. *McGrath v. Booth et al.*, No. 20-CV-11651-

19  FDS (D. Mass).

20     65.   On January 20, 2023, judgment was entered in McGrath's favor of

21  $3,107,195.43 plus interest and attorney's fees of $182,862.48.

V E N A B L E  L L P
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

66.    McGrath is concurrently with this action filing a complaint against Cope's Estate, J.P. Cope, and Brewer in the United States District Court for the Western District of Texas to hold them liable to McGrath in that same amount for the damages he suffered at the hands of Booth and Cope.

**The Estate Begins Liquidating Assets Below Market Value, including the Bighorn Property, to Avoid Paying Its Creditors**

67.    After Cope passed away in December 2020, probate proceedings commenced in Midland County, Texas.  Initially, J.P. Cope was appointed as the Executor of the Estate.  J.P. Cope is also a beneficiary of the Estate.

68.    By December 2020, the Estate was or should have been on notice that it faced liability to the victims of Cope and Booth's Ponzi Scheme, including to victims that had not yet been identified or that had not yet sued Booth or Cope's Estate.

69.    To avoid having to use its assets to compensate the victims and others with claims against Cope, who had lived well beyond his means, the Estate, at J.P. Cope's direction, put into motion a scheme to liquidate certain assets at below-market nominal values while simultaneously engaging in side deals with the purchasers of those assets designed to transfer additional value to certain of the Estate's beneficiaries outside of the probate process or public scrutiny.

70.    The Estate owned the Bighorn Property.

COMPLAINT

71.     On May 18, 2021, J.P. Cope, acting as Executor of the Estate, entered an agreement to sell the Bighorn Property to Palowet for $2.8 million.  The property was not listed for sale to the public.  Less than a week later, on May 24, 2021, Palowet filed Articles of Incorporation with the California Secretary of State designating the Bighorn Property, a residential dwelling, as its principal business address.

72.     The Bighorn Property was worth substantially more than $2.8 million at the time of the sale, so the transaction price represented a considerable discount from market value. Other surviving members of the Cope family, who were beneficiaries of the Estate, opposed the sale and attempted to block it.

73.     On September 30, 2021, J.P. Cope and the other beneficiaries of the Estate entered the Cope Family Settlement Agreement.  Pursuant to that agreement, J.P. Cope stepped down as Executor of the Estate.  Brewer, Cope's daughter, became the Executor.  In addition, on completion of the sale of the Bighorn Property, J.P. Cope agreed to a reduced distribution from the Estate from $500,000 to $400,000.

74.     On November 8, 2021, the Estate initiated ancillary probate proceedings in Riverside County, California, the county in which the Bighorn Property is located ("Riverside County Probate Proceedings").  On March 24, 2022, Brewer, now acting as the Executor of the Estate, filed a Notice of Proposed Action to close the sale of the Bighorn Property at the same terms previously agreed to with

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

COMPLAINT

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA 90067
310-229-9900

Palowet Investments, LLC.  In April 2022, the Estate closed the sale of the Bighorn Property on those terms, at a price far below the market value of the property.

75.    On information and belief, Palowet knew that it was obtaining the Bighorn Property for below market value.  At the very least, it should have known that.  On information and belief, J.P. Cope entered a valuable side deal with Palowet or with its sole member, Clay Hunt, in consideration of selling Palowet the Bighorn Property for such a low value.  The consideration exchange in this side deal would ordinarily be out of the reach of creditors of the Estate, including McGrath.

76.    On July 28, 2022, the Estate filed its First and Final Report ("Final Report") in the Riverside County Probate Proceedings. The Final Report listed a single bank account as the only asset of the Estate in Riverside County.  This bank account contained the proceeds of the Bighorn Property sale.  In the Final Report, the Estate represented that it had no anticipated liabilities, that it had no creditors, and that it had provided notice to all creditors and interested parties.   This representation was false at the time it was made.  The Estate had been named a defendant in the July 9, 2021 lawsuit filed by Convoy.  On information and belief, the Estate knew about and failed to disclose other anticipated liabilities and creditors, which it has acknowledged.  The Estate also failed to provide notice to all creditors and interested parties.

77.    On November 3, 2022, the Probate Court, unaware of the Estate's failures to properly provide notice to interested parties and unaware of the Estate's

1   creditors, approved the Final Report.  This allowed the Estate to complete the fraud

2   on its creditors.

3       78.    In short, on information and belief, J.P. Cope and/or Brewer, working

4   with unscrupulous counterparties like Palowet, have liquidated assets of the Estate,

5   including the Bighorn Property, for well below market value, in conjunction with

6   side deals to prevent creditors of the Estate from recovering amounts owed.  On

7   information and belief, J.P. Cope has personally benefitted from these side deals

8   meant to enrich him at the expense of creditors to the Estate, and Brewer has, on

9   information and belief, willingly and knowingly ratified these self-serving

10  transactions intended to defraud creditors to the benefit of insiders and has concealed

11  material facts from the probate court to obtain judicial approval of their fraudulent

12  transfer.

### FIRST CAUSE OF ACTION

#### Voidable Transfer

15      79.    Plaintiff incorporates by reference each and every allegation contained

16  in Paragraphs 1 through 78 as though fully set forth herein.

17      80.    The Estate is liable to the many victims of Cope and Booth's Ponzi

18  Scheme because of Cope's central involvement with the Ponzi Scheme.

19  Accordingly, the Estate is a debtor within the meaning of the California Uniform

20  Voidable Transactions Act, Cal. Civ. Code § 3439.01.

21

VENABLE LLP
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

81.     Cope was jointly and severally liable with Booth for all damages to McGrath resulting from McGrath's involvement with the Ponzi Scheme.

82.     The Estate became liable to McGrath upon the passing of Cope.

83.     McGrath is a creditor of the Estate within the meaning of the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.01.

84.     The Estate, acting through and with J.P. Cope and Brewer, sold off the Bighorn Property to Palowet for far less than market value.

85.     The Estate, acting through and with J.P. Cope and Brewer, sold the Bighorn Property to Palowet, with the actual intent to hinder, delay, or defraud creditors of the Estate, including McGrath.

86.     In addition, the Estate did not receive reasonably equivalent value for the Bighorn Property from Palowet.

87.     The Estate, J.P. Cope, and Brewer were all aware or should have reasonably been aware that the Estate would be unable to pay its obligations to the victims of the Ponzi Scheme as those obligations became due.

88.     The sale of the Bighorn Property was concealed from potential creditors by virtue of the Estate's failure to disclose its creditors or other interested parties in the Riverside County Probate Proceedings.

89.     At the time of the closing of the sale of the Bighorn Property, the Estate had been sued by Convoy and was on notice of its liability to other potential creditors.

-22-

COMPLAINT

90.     Palowet knew that it was obtaining the Bighorn Property for far less than reasonably equivalent value.  Instead, on information and belief, Palowet furthered the fraudulent transfer scheme by entering side agreements with J.P. Cope and potentially other beneficiaries of the Estate.  Accordingly, Palowet is not one who took in good faith and for a reasonably equivalent value, within the meaning of the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.08.

91.     Therefore, the Estate's sale of the Bighorn Property to Palowet was a voidable transfer within the meaning of the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.04.

92.     Under the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439.07, McGrath is entitled to avoidance of the sale of the Bighorn Property up to the value of his claim against the Estate, and an injunction against further disposition of the Bighorn Property.

## SECOND CAUSE OF ACTION

### Civil Conspiracy

93.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 92 as though fully set forth herein.

94.     J.P. Cope and Brewer are beneficiaries of the Estate, and served at different times as executors of the Estate.  The Estate was jointly and severally liable to McGrath for the damages suffered as a result of McGrath's unwitting involvement with Cope and Booth's Ponzi Scheme.

1   95.    J.P. Cope and Brewer were aware of this potential liability due to other

2   civil actions filed by other victims of that scheme, including by Bighorn Ventures

3   and Convoy.   As such, J.P. Cope and Brewer were on notice that other creditors

4   would likely be filing similar claims against the Estate and were aware that the Estate

5   lacked assets to satisfy the claims of existing creditors, including but not limited to

6   Convoy.

7   96.    Based on their knowledge of forthcoming creditors' claims and the

8   alleged circumstances of Cope's involvement in the Ponzi Scheme, Brewer and J.P.

9   Cope were aware that delay in distributing the Estate's assets among the

10   beneficiaries would potentially result in the reduction or elimination of any

11   inheritance they might ultimately receive.

12   97.    The Bighorn Property was one such asset of the Estate.   Because it was

13   located in Riverside County, California, it could be distributed separately (and more

14   quickly) from the distribution of the rest of the Estate through ancillary probate

15   proceedings in Riverside County.   The Estate just needed to find a willing

16   counterparty for its scheme.

17   98.    Palowet proved to be the willing counterparty.   It agreed to purchase

18   the Bighorn Property at far less than market value.   In return, on information and

19   belief, Palowet entered beneficial side agreements with J.P. Cope and potentially

20   other beneficiaries of the Estate.

21

-24-

COMPLAINT

99.    As such, the Estate, acting through Brewer and J.P. Cope, and Palowet came to an agreement to engage in a course of action designed to evade the ability of potential creditors – including McGrath – to reach the Estate's assets.

100.    Specifically, the Estate sold the Bighorn Property to Palowet for far less than market value.  The aim of this transaction was to ensure speedy access to cash that could be distributed among the Estate's beneficiaries in the hopes of preventing recovery by the Estate's creditors prior to distribution among the beneficiaries.  It also on information and belief ensured that J.P. Cope would, through side deals, take assets from the Estate that would otherwise be owed to creditors.

101.    This course of action was wrongful.  Palowet knew or should have known it was wrongful because it entered a side deal with J.P. Cope and potentially others to make the sale go through.

102.    Palowet directly profited as a result of its wrongful conduct.

103.    As a direct and proximate result of Palowet's conspiracy with the Estate, McGrath was damaged. The conspiracy conduct potentially renders the Estate unable to satisfy its judgment owed to McGrath

104.    As such, Palowet should be held personally liable for any recovery obtained by McGrath against the Estate to the extent the Estate's assets are no longer sufficient to cover such a judgment.

105.    As this conduct was willful and wanton, with an intent to defraud, punitive damages should issue against Palowet.

-25-

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sean P. McGrath respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant Palowet Investments, LLC, and award the following relief to Plaintiff and against Defendants:

1.      Avoidance of the sale of the Bighorn Property from the Estate to Palowet;

2.      An injunction prohibiting any further disposition of the Bighorn Property by Palowet;

3.      Damages, in an amount to be proven at trial, including punitive damages;

4.      Pre- and post-judgment interest at the maximum rate permitted by law;

5.      Costs of this action; and

6.      Such other relief as the Court may deem just and proper.


Dated:  September 29, 2023                    VENABLE LLP



By:  _/s/ Ryan M. Lapine_
                                                    Ryan M. Lapine
                                                    Rodney S. Lasher
                                                    Rachel E. Conover

                                                    *Attorneys for Plaintiff*
                                                    *Sean P. McGrath*

**V E N A B L E  L L P**
2049 CENTURY PARK EAST, SUITE 2300
LOS ANGELES, CA  90067
310-229-9900

COMPLAINT

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff Sean P. McGrath hereby demands trial by jury on all issues and causes of action triable by jury.


Dated:  September 29, 2023                    VENABLE LLP



By:   */s/ Ryan M. Lapine*
                                                      Ryan M. Lapine
                                                      Rodney S. Lasher
                                                      Rachel E. Conover

                                                      *Attorneys for Plaintiff*
                                                      *Sean P. McGrath*

COMPLAINT